

# NUMBER 13-18-00472-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**GEORGE GARCIA, ET AL.,**                                              **Appellants,**

**v.**

**GREGORY K. PROPST, INDIVIDUALLY
AND DERIVATIVELY ON BEHALF OF
RIOSTAR SOLUTIONS, INC.,**                                              **Appellee.**

---

### On appeal from the 275th District Court
### of Hidalgo County, Texas.

---

# OPINION

### Before Justices Benavides, Longoria, and Perkes
### Opinion by Justice Perkes

Appellee Gregory K. Propst (Greg), individually and derivatively on behalf of

RioStar Solutions, Inc., sued, among others, appellants George Garcia, J Brokerage

Corp., Daniel Diaz, Frank Diaz, Tim O'Bannon, S. Katzman Produce, Inc., Katzman Berry

Corp., Top Katz Brokers, LLC, Stephen Katzman, Joseph Palumbo, Mario Andreani,

Patterson Companies, Inc., Sweet Life Logistics, Inc., and Sweet Life Transportation, Inc., all nonresidents, for various business-related torts. On interlocutory appeal, appellants contend by two issues that (1) the trial court erred in denying their special appearances, and (2) the trial court abused its discretion in sustaining Greg's objections to portions of their jurisdictional evidence. We affirm in part and reverse and render in part.

## I. BACKGROUND

In 2013, Greg and his nephew Christopher Propst (Chris), formed RioStar Solutions, Inc. (RioStar), a Texas corporation with its principal place of business in McAllen, Texas, as the corporation's sole shareholders, directors, and officers. From its inception, RioStar entered into an "Independent Contractor/Sales Agent Agreement" (Sales Agreement) with appellants Patterson Companies, Inc. and Sweet Life Logistics, Inc (collectively Patterson), affiliated Florida corporations with their principal places of business in Florida.[1]

Patterson is a federally licensed freight broker that acts as an intermediary between shippers, receivers, and carriers.[2] Patterson contracts with independent sales agents, such as RioStar, to operate under Patterson's name and license in different parts of the country. The Sales Agreement between Patterson and RioStar generally provided that RioStar would solicit business on behalf of Patterson in exchange for a commission. Patterson agreed to provide RioStar with financing for start-up costs, promotional materials, logistical support, and access to proprietary information such as software,

---

[1] At the time of the Sales Agreement, Patterson Companies, Inc. was known as Patterson Freight Systems, Inc. and Sweet Life Logistics, Inc. was known as Sam Patterson Truck Brothers, Inc.

[2] The primary distinction between the two Patterson entities is that Patterson Companies, Inc. serves the perishable goods market while Sweet Life Logistics, Inc. focuses on nonperishable goods.

shipper and carrier lists, and rates charged. The Sales Agreement allowed either party to terminate the contract upon written notice and included a Florida forum-selection and choice-of-law provision. The Sales Agreement included a provision stating that RioStar would be Patterson's exclusive agent for "Texas and Mexico through 2015." A significant portion of the customers RioStar solicited on behalf of Patterson were based in South Texas, especially agricultural producers.

RioStar thereafter entered into a Management Services Agreement (Management Agreement) with Stride Investments, LLC (Stride), a Texas company wholly owned by Chris. Chris was already operating as an independent sales agent for Patterson prior to forming RioStar with Greg. Under the Management Agreement, Stride, through Chris's expertise, agreed to act as an external consultant to RioStar in exchange for an annual fee. Stride also agreed that it would not disclose RioStar's proprietary information or engage in other management services that would create a conflict of interest.

Over the next three years, the relationship between Greg and Chris deteriorated, leading to uncertainty about RioStar's future in the summer of 2016. Chris ultimately elected to leave RioStar and open a competing brokerage in McAllen, taking several of RioStar's employees with him and, according to Greg, RioStar's proprietary information and customers. Greg filed this lawsuit in September 2016, bringing claims against Chris and Stride for breach of fiduciary duty and claims against Chris, Stride, and the former RioStar employees for violating the Texas Uniform Trade Secrets Act and the "Texas Civil Theft Act."

Greg also alleged that a group of Patterson officers and independent contractors, appellants George Garcia, J Brokerage Corp., Daniel Diaz, Frank Diaz, and Tim

O'Bannon (collectively referred to as the "Garcia Group" in the petition), and a group of Patterson clients and their affiliated companies and principals, appellants S. Katzman Produce, Inc., Katzman Berry Corp., Top Katz Brokers, LLC, Stephen Katzman, Joseph Palumbo, and Mario Andreani (collectively referred to as "Katzman" in the petition), formed a civil conspiracy to lure Chris away from RioStar and Patterson and "join Garcia Group and Katzman in a new venture offering transportation management services in direct competition with RioStar." Greg sued the "Garcia Group" and "Katzman" for aiding and abetting Chris's breach of fiduciary duty and the "Garcia Group" for tortious interference with a contract. However, the petition failed to identify which of the eleven appellants were the principal actors in the conspiracy, attributing acts generally to the "Garcia Group" and "Katzman." Moreover, the petition failed to allege that any act in furtherance of the conspiracy occurred in Texas or that the conspiracy ever came to fruition (i.e., that these appellants ever opened a competing brokerage in Texas).

Appellants Patterson Companies, Inc., Sweet Life Logistics, Inc., and Sweet Life Transportation, Inc. were not originally named in the suit. With Greg and Chris unable to resolve their dispute, Patterson Companies, Inc. and Sweet Life Logistics, Inc. exercised their right to terminate the Sales Agreement with RioStar and offered individual contracts to both Greg and Chris. Greg declined[3] but Chris accepted, entering into a "Broker/Sales Agent Agreement" with Patterson Companies, Inc., Sweet Life Logistics, Inc., and Sweet

---

[3] In an August 15, 2016 email, Greg tried to convince the principal owner of the Patterson entities that "setting Chris up as a competing Patterson agent in McAllen, TX . . . would be hugely detrimental to RioStar as well as Patterson." Greg wanted the Patterson entities to maintain an exclusive relationship with RioStar. When that did not happen, Greg and RioStar elected to work with another licensed broker.

Life Transportation, Inc.[4] (collectively Patterson Companies) on September 27, 2016. Greg subsequently amended his petition by alleging the Patterson Companies were providing Chris's competing brokerage with the same financial, promotional, and logistical support previously provided to RioStar under the Sales Agreement, and thereby aiding and abetting Chris, Stride, and the former RioStar employees in breaching their fiduciary duties to RioStar and tortiously interfering in its contractual relationships with those parties.[5]

When the suit was filed, the trial court granted Greg's request for a temporary restraining order against the original defendants, enjoining them from "[a]cting as an agent of or doing business in Texas under Patterson's brokerage license." A corporate representative for Patterson Companies, Inc. filed an affidavit opposing Greg's request for a temporary injunction, averring that not doing business in Texas would cost the company "gross revenues in the amount of $10,000,000.00 or more." The trial court lifted the prohibition but required Chris to pay RioStar a monthly royalty on commissions. This latter order was subsequently reversed.[6]

Three special appearances were filed, one on behalf of each group of appellants identified in the petition. They all contended that Greg failed to meet his initial pleading burden and verified that the appellants were nonresidents. Jurisdictional discovery was

---

[4] Sweet Life Transportation, Inc. is a federally licensed motor carrier, not a federally licensed transportation broker like Patterson Companies, Inc. and Sweet Life Logistics, Inc.

[5] Patterson Companies, Inc. and Sweet Life Logistics, Inc. have sued Greg and RioStar in Florida, alleging violations of noncompete and confidentiality provisions in the Sales Agreement.

[6] The temporary injunction was the subject of another interlocutory appeal in this Court. *See Propst v. Propst*, No. 13-18-00291-CV, 2019 WL 5609964 (Tex. App.—Corpus Christi–Edinburg Oct. 31 2019, no pet. h.).

conducted, and each party filed evidence to support their position. Greg's evidence consisted of deposition transcripts, recorded phone conversations, emails, and various business records, while appellants relied primarily on affidavits. Greg objected to numerous portions of these affidavits on various grounds, all of which were sustained by the trial court. During the hearing, Greg abandoned his allegation of general jurisdiction, relying solely on specific jurisdiction.[7] The trial court denied the special appearances as to each appellant and this interlocutory appeal ensued. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7).

## II. STANDARD OF REVIEW & APPLICABLE LAW

### A. Standard of Review

Whether a trial court may exercise personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016) (citing *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002)). "When, as here, the trial court did not issue findings of fact and conclusions of law, all relevant facts that are necessary to support the judgment and supported by evidence are implied." *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

### B. Personal Jurisdiction

Under Texas's long-arm statute, Texas courts may exercise personal jurisdiction over a nonresident defendant that "does business" in Texas. *See* TEX. CIV. PRAC. & REM.

---

[7] Greg's petition generally alleges that "[e]ach nonresident Defendant has minimum contacts with the State of Texas necessary to establish specific and general jurisdiction."

6

CODE ANN. §§ 17.041, .042; *PHC-Minden, L.P., v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007). Because the exercise of personal jurisdiction over a nonresident implicates due process concerns, the Texas long-arm statute reaches only "as far as the federal constitutional requirements of due process will permit." *PHC-Minden*, 235 S.W.3d at 166 (quoting *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)); *see Goodyear Dunlop Tires Operations, S.A., v. Brown*, 564 U.S. 915, 918 (2011) ("A state court's assertion of jurisdiction exposes defendants to the State's coercive power, and is therefore subject to review for compatibility with the Fourteenth Amendment's Due Process Clause." (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945))).

The exercise of personal jurisdiction satisfies due process if (1) the nonresident defendant established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *Int'l Shoe*, 326 U.S. at 316). When a nonresident defendant purposefully avails itself of the privileges and benefits of conducting business in a foreign jurisdiction, its contacts are sufficient to confer the forum with personal jurisdiction. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013) (citing *Republic Drilling*, 278 S.W.3d at 338)). Only the defendant's purposeful contacts are relevant to the inquiry; unilateral activity of another party or third person, as well as random, isolated, or fortuitous contacts by the defendant, are insufficient to prove that the defendant purposefully availed itself. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, LP*, 493 S.W.3d 65, 70 (Tex. 2016) (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)).

7

Once minimum contacts have been established, the exercise of jurisdiction will typically comport with traditional notions of fair play and substantial justice. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010) (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, PLC*, 815 S.W.2d 223, 231 (Tex. 1991)). The defendant must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Id.* at 879 (quoting *Guardian Royal*, 815 S.W.2d at 231).

There are two types of personal jurisdiction, specific and general. *Id.* at 71; s*ee generally Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (adopting the terms "general" and "specific" to describe the two types of personal jurisdiction). The exercise of specific jurisdiction is appropriate when the plaintiff's claim arises from or relates to the defendant's contacts with the forum state. *Cornerstone Healthcare*, 493 S.W.3d at 71 (citing *Spir Star*, 310 S.W.3d at 873). In other words, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007).

## C.    Shifting Burdens

The plaintiff bears the initial burden of alleging facts that establish the trial court's jurisdiction under the Long-Arm Statute (e.g., for a tort claim, that the defendant committed tortious acts in Texas). *Searcy*, 496 S.W.3d at 66 (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009)). The burden then shifts to the defendant to negate all bases for personal jurisdiction that exist in the plaintiff's pleading. *Id.* (citing *Republic Drilling*, 278 S.W.3d at 337).

If the plaintiff fails to meet its pleading burden, however, "the defendant need only prove that it does not live in Texas to negate jurisdiction." *Kelly v. Gen. Interior Constr.,*

*Inc.*, 301 S.W.3d 653, 659 (Tex. 2010) (citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982)). The burden then shifts back to the plaintiff to present rebuttal evidence that establishes personal jurisdiction. *See id.* at 660 (acknowledging that, although the plaintiff "failed to plead jurisdictional facts" and the defendants met "their burden to negate all basis of jurisdiction by proving that they do not live in Texas," the plaintiff had the opportunity to "present any responsive evidence establishing the requisite link with Texas."); *see also* TEX. R. CIV. P. 120a(3) ("The court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of the discovery processes, and any oral testimony."). "If the plaintiff's evidence does not fall within the scope of the factual allegations in the pleading, then the plaintiff should amend the pleading for consistency." *Kelly*, 301 S.W.3d at 659 n.4.

## D.    A Conspiracy Alone Does Not Establish Jurisdiction

"The mere existence or allegation of a conspiracy directed at Texas is not sufficient to confer jurisdiction." *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 560 (Tex. 2018) (citing *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995)). Moreover, a plaintiff cannot impute jurisdictional contacts between co-conspirators; to satisfy due process, each defendant himself must have minimum contacts with Texas that are substantially connected to the operative facts of the litigation. *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437 (Tex. 1982) (citing *Rush v. Savchuk*, 444 U.S. 320 (1980)); *see also TV Azteca v. Ruiz*, 490 S.W.3d 29, 52 (Tex. 2016) ("When determining personal jurisdiction, '[e]ach defendant's contacts with the forum State must be assessed individually.'" (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1984))).

III. ANALYSIS

## A. Patterson Companies

Greg satisfied his pleading burden against the Patterson Companies, and provided evidence—largely uncontroverted—that affirmed his jurisdictional allegations. *See Kelly*, 301 S.W.3d at 659. Accordingly, the record establishes that the Patterson Companies had minimum contacts with the forum that were substantially connected to the operative facts of Greg's lawsuit. *See id.*

### 1. Minimum Contacts

After Patterson Companies, Inc. and Sweet Life Logistics, Inc. terminated the Sales Agreement with RioStar, they, along with Sweet Life Transportation, Inc., entered into an agreement with Chris that allowed him to act as their sales agent in Texas.[8] That agreement created a purposeful and substantial connection between the Patterson Companies and the forum, not only because Chris performed under the agreement in Texas, but because it allowed the Patterson Companies to repeatedly service and profit from the Texas market, creating a contact with the forum every time Chris arranged a load on their behalf. *See Michiana*, 168 S.W.3d at 787 (explaining that even a single contract can establish minimum contacts, especially when "it involves many contacts over a long period of time" (citing *CMMC v. Salinas*, 929 S.W.2d 435, 440 (Tex. 1996)).

The fact that Chris operates as an independent contractor instead of a Patterson employee is immaterial to the jurisdictional analysis. *See TV Azteca*, 490 S.W.3d at 51 ("[A] defendant who 'intentionally targets Texas as the marketplace for its products' is

---

[8] The agreement does not distinguish between the three entities, referring to them collectively as "Patterson" throughout the agreement.

10

subject to specific jurisdiction, and 'using a distributor-intermediary for the purpose provides no haven from the jurisdiction of a Texas court.'" (quoting *Spir Star*, 310 S.W.3d at 871)). To be sure, Chris holds himself out as an authorized representative of the "Patterson Companies." Every shipment is brokered under the authority of their federal licenses, bonded by their insurance, and constitutes a service agreement between the Patterson Companies and their customer.

And, of course, the Patterson Companies derive a significant financial benefit from providing their services to the Texas market; a corporate representative for Patterson Companies, Inc. stated that prohibiting the company from doing business in Texas during the pendency of this case would cost the company "gross revenues in the amount of $10,000,000.00 or more." The Patterson Companies also routinely advance fuel costs to carriers, including those in Texas. The sum of their contacts with Texas since entering the new agreement with Chris on September 27, 2016, is significant, all with an eye toward "getting extensive business in or from the forum state." *See Moncrief Oil*, 414 S.W.3d at 153 (quoting *Michiana*, 168 S.W.3d at 789–90).

### 2. Forum-Selection Clause

Patterson Companies, Inc. and Sweet Life Logistics, Inc. point to the Florida forum-selection clause in their Sales Agreement with RioStar as proof that they did not intend to purposely avail themselves of the forum.[9] To be clear, neither appellant filed a motion to dismiss, seeking to enforce the clause. *See generally In re Longoria*, 470 S.W.3d 616, 625 (Tex. App.—Houston [14th Dist.] 2015, orig. proceeding) ("Forum-selection clauses

---

[9] This section does not apply to Sweet Life Transportation, Inc., who was not a party to the Sales Agreement.

11

are generally enforceable and presumptively valid." (citing *In re Laibe Corp.*, 307 S.W.3d 314, 316 (Tex. 2010) (orig. proceeding) (per curiam))); *Deep Water Slender Wells, Ltd. v. Shell Intern. Exploration & Production, Inc.*, 234 S.W.3d 679, 687 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("A motion to dismiss is the proper procedural mechanism for enforcing a forum-selection clause that a party to the agreement has violated in filing suit." (citing *In re AIU Ins. Co.*, 148 S.W.3d 109, 111–21 (Tex. 2004) (orig. proceeding))). In fact, Patterson Companies, Inc. and Sweet Life Logistics, Inc. concede in their brief to this Court that "Greg's claims do not arise out of the [Sales] Agreement." *See In re Longoria*, 470 S.W.3d at 625 ("The court must first determine whether the claims fall within the scope of the forum-selection clause." (citing *Deep Water Slender Wells*, 234 S.W.3d at 687–88)).[10]

Nevertheless, they ask us to consider the forum-selection clause for the limited purpose of determining purposeful availment, citing *Michiana* for the proposition that "a clause designating a foreign forum suggests that no local availment was intended." *See* 168 S.W.3d at 792. The *Michiana* Court explained, however, that "a forum-selection clause operates as consent to jurisdiction in one forum, not proof that the Constitution would allow no other." *Id.* (citing *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595 (1991). Thus, while a forum selection clause "cannot be ignored," it "does not necessarily indicate [the nonresident] had no minimum contacts anywhere else." *Id.*

Although the *Michiana* Court ultimately determined that the defendant did not purposefully avail itself of the forum, the Court did not rely exclusively on the forum-

---

[10] We do not offer any opinion regarding the enforceability of the forum-selection clause.

selection clause to reach that conclusion. *Id.* at 784–94. Instead, finding "[n]either [wa]s sufficient," the Court rejected the two contacts relied on by the court of appeals in affirming the denial of the special appearance. *Id.* at 788. The forum-selection clause was only "additional proof" that the defendant did not purposefully avail itself of the forum. *Id.* at 792.

Unlike *Michiana*, we have already determined that Patterson Companies, Inc. and Sweet Life Logistics, Inc. had significant contacts with Texas. Perhaps more importantly, those contacts occurred *after* the Sales Agreement was terminated. Because Patterson Companies, Inc. and Sweet Life Logistics, Inc. concede that Greg's claims are beyond the scope of the forum-selection clause, we need not decide whether the quality of those contacts would overcome any contrary "suggest[ion]" raised by the clause. *See id.*

### 3. Substantially Connected

Finally, we find that Greg's claims that the Patterson Companies tortiously interfered with RioStar's contractual relationships and aided and abetted Chris in breaching his fiduciary duty to RioStar are substantially connected to the operative facts of the litigation, which center on Chris's conduct once he left RioStar and separately began representing the Patterson Companies. *See Moki Mac*, 221 S.W.3d at 585. One of the key disputes in the litigation is whether the proprietary information Chris allegedly misappropriated from RioStar, "including customer names and contact information, account information, rates, forms, [and] marketing materials," actually belongs to the Patterson Companies. *See id.*

We overrule the Patterson Companies' first issue.

13

**B.      The Conspiracy Between "Garcia Group" and "Katzman"**

As noted, Greg alleges a conspiracy between eleven of the appellants but fails to identify the principal actors in the conspiracy or allege that any act in furtherance of the conspiracy occurred in Texas. *See Kelly*, 301 S.W.3d at 660 ("[A]lthough GIC has alleged two claims of wrongdoing, it has not alleged that any acts giving rise to these two claims occurred in Texas."). Instead, Greg's allegation that the conspiracy had a "plan to dominate the Texas market" is nothing more than an "allegation of a conspiracy directed at Texas" that is insufficient to confer jurisdiction. *See Old Republic*, 549 S.W.3d at 560 (citing *Gibson*, 897 S.W.2d at 773).

Accordingly, these appellants satisfied their burden to negate jurisdiction by proving that they were not Texas residents. *See Kelly*, 301 S.W.3d at 659. But that does not end our inquiry; the burden then shifted back to Greg to "present any responsive evidence establishing the requisite link with Texas" that was "within the scope of the factual allegations in the pleading." *See id.* at 659 n.4, 660.

**1.      George Garcia and Daniel Diaz**

Greg produced evidence that George Garcia and Daniel Diaz solicited Chris to leave RioStar and join them as a partner in a new brokerage that would compete with the Patterson Companies and RioStar in Texas. This evidence primarily consisted of a series of phone conversations between Greg and Chris in early September 2016 that were secretly recorded by Greg, including the following exchange:

CHRIS:      All of this stuff has gone wrong because George and Danny promised me that they were opening a new company.

GREG:      Like a new brokers company or what?

14

CHRIS:     Yes.

. . . .

CHRIS:     But they promised that I was gonna be a partner in a new company. And so I screwed up, thinking, "Okay. Well, I guess I can go do something with you guys." And that's where I've been. And I messed up. In mean, they—like you told me, they—don't have my back. I don't even believe that they—I, honestly, right now, think that they've done all this to destroy the office to be able to go do their office—is what I think.

GREG:      To do their office—what—Patterson down here? Or what do you think?

CHRIS:     No. No. No. No. To do their new office. They wanted us to dissolve, so they can take the business from Texas—is what I think.

Although they disputed Chris's characterization of their conversations,[11] both George and Daniel acknowledged that they spoke with Chris by telephone in the summer of 2016. Whether a tort occurred as a result of these conversations is not our concern. *See Michiana*, 168 S.W.3d at 790–92 (rejecting the idea that personal jurisdiction should turn on viability of the claim). Instead, "[w]hen communications between a nonresident and a resident are alleged as the basis for jurisdiction, we look to the quality and nature of the communications to establish purposeful availment." *Old Republic*, 549 S.W.3d at 560 (citing *Searcy*, 496 S.W.3d at 74).

---

[11] Daniel stated in an affidavit that Chris called him, they spoke only about Chris's frustrations with Greg, and that Daniel encouraged Chris to work things out with Greg. During his deposition, George also said that he counseled Chris to work things out with Greg but did acknowledge that he told Chris that he may leave Patterson in the future and that Chris could join him. But George insisted that he never negotiated with Chris or offered him a partnership in a new venture because he did not have any specific plans to leave Patterson at that time: "There was [sic] conversations, broad conversations, if down the road Patterson takes this direction, that's not the direction that I want to go. I may look for a different revenue, and you're more than welcome to come if you choose."

The evidence produced by Greg supports an implied finding by the trial court that George and Daniel "sought a benefit, advantage, or profit from these calls" by seeking to take the book of business that Chris had established in South Texas on behalf of Patterson and RioStar and make it their own. *See id.* at 558, 561. Their contacts were purposeful because they were "aimed at getting extensive business in or from the forum state." *See Moncrief Oil*, 414 S.W.3d at 153 (quoting *Michiana*, 168 S.W.3d at 789–90).

Further, there is more than a substantial connection between these contacts and the operative facts of Greg's claims against George and Daniel—they are one and the same. By inducing Chris to leave RioStar through alleged "aggressive recruiting efforts," George and Daniel may have tortiously interfered with the contractual relationships between RioStar, Chris, Stride, and the former RioStar employees, and may have aided and abetted Chris in breaching his fiduciary duties to RioStar. *See Moki Mac*, 221 S.W.3d at 585. Accordingly, we overrule George and Daniel's' first issue.

However, their contacts cannot be imputed to the nine other alleged conspirators. *See Siskind*, 642 S.W.2d at 437 (citing *Rush*, 444 U.S. 320). Instead, "[e]ach defendant's contacts with the forum State must be assessed individually." *TV Azteca*, 490 S.W.3d at 52 (quoting *Calder*, 465 U.S. at 790). Greg failed to establish that any of the other conspirators had minimum contacts with Texas that were substantially connected to the operative facts of the litigation. *See Moki Mac*, 221 S.W.3d at 585.

### 2. J Brokerage Corp.

J Brokerage Corp. is a Florida corporation with its principal place of business in Florida. George Garcia is its sole shareholder and it operates in the same fashion that RioStar operated under the Sales Agreement, soliciting business on behalf of Patterson

16

as an independent contractor/sales agent because it is not a federally licensed transportation broker in its own right.

Greg suggests in his brief that George was acting on behalf of J Brokerage Corp. when he solicited Chris to leave RioStar and Patterson, but there is no evidence in the record to support that assertion. Nor did Greg allege or prove that George's contacts should be imputed to J Brokerage Corp. based on an alter ego theory. *See generally Watamar Holding S.A. v. SFM Holdings, S.A.*, 583 S.W.3d 318, 332 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (discussing the standard for jurisdictional veil-piercing between an individual and a corporation). We sustain J Brokerage Corp.'s first issue.

### 3. Frank Diaz and Tim O'Bannon

The record evidence supports an implied finding that Frank Diaz and Tim O'Bannon were part of the group that may have planned to form a new business, but nothing more. There is no evidence that either individual solicited Chris to leave RioStar and Patterson or had any other minimum contacts with Texas that were substantially connected to Greg's claims. *See Moki Mac*, 221 S.W.3d at 585. We sustain Frank Diaz and Tim O'Bannon's first issue.

### 4. S. Katzman Produce, Inc., Katzman Berry Corp., Top Katz Brokers, LLC, Stephen Katzman, Joseph Palumbo, and Mario Andreani.

Stephen Katzman owns S. Katzman Produce, Inc. and Katzman Berry Corp. and shares an ownership interest in Top Katz Brokers, LLC with Joseph Palumbo and Mario Andreani (collectively Katzman Group). All three Katzman Group entities are involved in the produce industry. As Stephen Katzman acknowledges in his affidavit, these entities "purchase[] produce from suppliers all over the country, inncluding Texas, and use[] the

17

Patterson Companies to broker the transportation of said produce." Assuming, without deciding, that each entity and individual in the Katzman Group purposefully availed itself of the forum by agreeing to provide "support and financial backing" to a prospective business,[12] we conclude there is not a substantial connection between these contacts and the operative facts of the litigation. *See id.*

While Greg's claims against George and Daniel for aiding and abetting are derivative, his theory of joint and several liability against the Katzman Group based on a civil conspiracy is another step removed from the operative facts of the litigation. Greg's primary claim is that Chris breached his fiduciary duty to RioStar when he left and opened a competing brokerage, taking with him customers, employees, and proprietary information. Thus, the operative facts of Greg's suit principally concern Chris's conduct. *See id.* at 585. Then the evidence would turn to whether George and Daniel aided and abetted Chris by "inducing" him "to cut ties with RioStar and act against its interest."  *See id.* Only after answering these two questions would a jury then assess whether the Katzman Group are jointly and severally liable for George and Daniel's actions by forming a civil conspiracy with them to lure Chris away. *See id.* In other words, the Katzman Group's forum contacts would not be "the focus of the trial" or "consume most if not all of the litigation's attention." *See id.*; *TV Azteca*, 490 S.W.3d at 53.

At best, there is a "but-for" relatedness between their forum contacts and Greg's suit. But for the Katzman Group's "support and financial backing," George and Daniel would not have been in a position to solicit Chris to leave RioStar and join them. And but

---

[12] There is no evidence in the record that this "new venture" became a going concern.

for their solicitation, Chris may have reconciled with Greg instead of leaving and allegedly breaching his fiduciary duties to RioStar. Our Supreme Court rejected the "but-for" test because it was "too broad and judicially unmoored to satisfy due-process concerns." *Moki Mac*, 221 S.W.3d at 580–81. Because the Katzman Group's contacts are not sufficiently related to the operative facts of Greg's suit, we sustain their first issue. *See id.* at 585.

## C. Evidentiary Issues

By their second issue, Daniel Diaz and the Patterson Companies contend that the trial court abused its discretion in sustaining Greg's objections to various parts of the affidavits they filed to support their respective special appearances.[13] These affidavits generally deny the allegations in Greg's petition or the existence of any other minimum contacts with the forum that are substantially related to Greg's claims. Even if we assume that each objection was sustained in error, the inclusion of this evidence would not change our disposition. As we discussed, Greg produced evidence that (1) affirmed his jurisdictional allegations against these appellants and (2) was sufficient to support the order denying their special appearances; therefore, any conflicting inferences that could be drawn from these affidavits would not entitle these appellants to a reversal. *See Kelly*, 301 S.W.3d at 659 (explaining that even if "the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations[,] [t]he plaintiff can then respond with its own evidence that affirms its allegations"); *Old Republic*, 549 S.W.3d at 558 (citing *BMC Software*, 83 S.W.3d at 795). Accordingly, without reaching

---

[13] George did not file an affidavit; instead, the entire transcript of his deposition was admitted into evidence without objection.

the merits, we overrule their second issue for failure to demonstrate a reversible error. *See* TEX. R. APP. P. 44.1(a); *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex.2009).

## IV. CONCLUSION

We affirm the trial court's order denying the special appearances of George Garcia, Daniel Diaz, Patterson Companies, Inc., Sweet Life Logistics, Inc., and Sweet Life Transportation, Inc. We reverse the trial court's order denying the special appearances of J Brokerage Corp., Frank Diaz, Tim O'Bannon, S. Katzman Produce, Inc., Katzman Berry Corp., Top Katz Brokers, LLC, Stephen Katzman, Joseph Palumbo, and Mario Andreani and render judgment dismissing the claims against these appellants.

GREGORY T. PERKES
Justice

Delivered and filed the
30th day of January, 2020.